WILLIAMS, CLARKE CO., FOR ATLAS TRADING CO. ET AL v. UNITED STATES

**No. 5184.**—Invoices dated Dairen June 25, 1937, etc.
Certified June 26, 1937, etc.
Entered at Los Angeles, Calif., July 31, 1937, New York, May 18, 1938, etc.
Entry Nos. 1202, 829956, etc.

Third Division, Appellate Term

(Decided March 25, 1941)

*Harper & Harper* (*Abraham Gottfried* of counsel) for the appellants.
*Charles D. Lawrence*, Acting Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellee.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is an application for review of a decision rendered October 15, 1940, reported as Reap. Dec. 5034. A number of appeals were consolidated and tried as one case. The merchandise involved consists of hooked rugs exported from Manchuria between June, 1937, and February, 1939, and entered at the port of Los Angeles, Calif. The single judge found the dutiable value to be the export value as returned by the appraiser.

Reappraisements 124851–A and 125647–A were appraised at the entered value plus 10 per centum. The remaining appeals to re-

appraisement were so-called duress entries wherein the importer added to make market value 10 per centum in order to meet advances made by the appraiser. The merchandise was entered and appraised on the basis of export value as defined in section 402 (d) of the Tariff Act of 1930.

At the hearing below the importer stated the issue to be as follows:

If your Honor please, the issue in this case relates solely to a 10 per cent commission. The question resolved itself as to whether or not that commission is a buying commission or a selling commission. If a buying commission it would be non-dutiable, and selling commission, of course, would be dutiable.

The Government attorney made no objection to this statement and therefore we assume he acquiesced.

The importer called as its witness Mr. Robert Sewelson, general manager of the Atlas Trading Co., one of the plaintiffs herein. He stated that this merchandise was manufactured in Dairen by the firm of Kurano & Co. but that he purchased the same through the Asiatic Trading Co. When asked what offices the Asiatic Trading Co. performed for him at his request he stated:

A. They would inspect the merchandise and see that it was properly manufactured in accordance with our specifications which we would submit to them.

By Mr. GOTTFRIED:

Q. Did you pay them for that service?—A. They would charge us the commission for that particular service over and above the cost of the goods. That was my understanding.

Q. Was that an unusual transaction or method of doing business with reference to purchases that you made in the Orient?—A. No, it is the customary way of our doing business with all our connections in the Orient.

Q. Do you always have a buying agent?—A. We always have a buying agent.

Q. And do you always pay that buying agent a percentage, commission?—A. We do.

Q. For similar services?—A. We do.

The witness further testified that Kurano sold to other persons and mentioned the Oriental Purchasing Co. of Japan as one of Kurano's customers. He further testified that the Oriental Trading Co. had offered to act for him as buying agent with respect to this type of rug as made by Kurano & Co., who, according to the testimony, is the sole manufacturer in Dairen of this merchandise. He stated that he could have purchased directly from Kurano & Co. and that he had purchased a small shipment direct and had paid no buying commission on that shipment. He further stated that he never knew that the Asiatic Transport Co. had an exclusive contract with Kurano & Co. On cross-examination he gave the following testimony:

X Q. How did you get in touch with the Asiatic concern in the first place?—A. They had some sort of a broker in Los Angeles, a chap by the name of Terr, who was recommended to us, and he told us that the Asiatic Transport Co., he was connected with them in some manner, and that he would like to turn over a line

of rugs which they were the agents for or could offer to us on a percentage basis, and I——

X Q. What does that mean, on a percentage basis?—A. Well, I asked how it would be handled. He said they would charge us a commission of 10 per cent over the manufacturing cost of the goods, and he submitted samples and then I sent over our first order on the strength of——

X Q. You hadn't been over there at all?—A. Not prior. I had no interview with him prior to that transaction, no.

X Q. So the matter was represented to you in the first place that this Asiatic Transport Co. was somebody's agent?—A. Well, I don't recall exactly. He stated he had a connection with hooked rugs, he put it in words to that effect; I don't recall the exact conversation, in fact, I didn't pay much attention.

X Q. You didn't understand that the Asiatic Transport concern was the manufacturer, or did you? A. No, I did not.

X Q. And Mr. Terr advised you that they would charge you a fee for handling?—A. That is correct, yes.

X Q. And doing what you wanted done?—A. Well, he put it this way: They would charge the usual buying commission, "just as any arrangement which you have at the present time." He said, "I have this connection; I would be glad to turn it over to you."

X Q. So that is all you knew about it at the time?—A. At that time, yes.

X Q. Did you subsequently go over there?—A. Yes, in 1938.

The witness could make no explanation of why some of the invoices noted a selling commission and others a buying commission. He claimed that he asked the local representative here to have them state the facts.

There was received in evidence and marked exhibit 1 a letter transmitting a quotation from the Oriental Purchasing Co. of Kobe, Japan, which in our opinion has little or no evidentiary value in this case. It was from a different exporter and quotes a different rate of commission and fails to show whether the commission is a buying or a selling commission.

The defendant introduced exhibit 3, a special agent's report dated May 13, 1938. It makes reference to shipments of hooked rugs between the dates of January 1, 1937, to and including April 14, 1938. The special agent reported upon the relationship between the manufacturer and the Asiatic Transport Co. of Dairen, the shipper, and states:

This assistance is of various sorts, but chiefly financial. Mr. Sherell de Florance advances money to buy raw wool in Manchuria for Kurano's account; sends a man to oversee the purchasing and inspect the wool bought, as noted above under the discussion of invoice charges; has the wool mixed with cotton and hand-spun into yarn in Yingkou (Newchwang); uses the influence he possesses as Dairen representative of the Latvian Government, to obtain Hessian cloth, which is difficult to get under present commodity restriction; intercedes in a similar manner to obtain satisfactory German dyes; advances money to pay for such Hessian cloth and dyes; and from time to time reimburses Kurano, over and above the agreed price of the rugs, for unforeseen contingencies such as losses on wool dyed for orders subsequently cancelled by the American purchaser,

extra cost of spinning pure wool yarn, retention pay for skilled workers during periods of idleness, food for idle workers, etc.

Mr. Sherell de Florance was named as proprietor of the Asiatic Transport Co. The report contains the following statement relating to the commission:

The invoices up through No. 481 carry an item of "Commission" or "Selling Commission", while in the invoices from No. 500 onwards the same item appears as "Buying Commission". We were not offered any documentary evidence either to support the assessment of these commissions or to explain their nature. Mr. Sherell de Florance informed us verbally that he considers that averaged out over a period, the invoiced per se values represent his all-in cost of the goods, including stated price and extra-price payments, and that the item of "commission" is added to embody his net compensation. In the case of the Oriental Rug Co. the rate is 5% (on Invoice No. 502, 6%), and in the case of the Atlas Trading Co., 10%. The difference was explained to us as due to the fact that whereas the Oriental orders a few simple designs in easy colors, and never makes claims, Atlas orders numerous complicated designs, with at times as many as 35 colors per design, such colors largely to be worked out in detail in Dairen, and tends to be critical of the results and to present claims, as per correspondence exhibited. In fact, Mr. Sherell de Florance informed us that while he was satisfied to continue the Oriental business at 5% as heretofore, he was about to demand at least 15% from Atlas.

Exhibit 4 is a special agent's report dated February 1, 1939, concerning shipments made by the Oriental Purchasing Co. of Kobe. The transactions involved in the report were all within the period from 1934 to the first half of 1935 and are therefore too remote to be given any weight. Furthermore, they relate to entirely different transactions between entirely different parties and furnish no basis for determining whether or not the agreement between this importer and the shipper called for a buying or selling commission.

In this situation it is our judgment that the opinion of the court below should be and the same is hereby affirmed.

Judgment will be rendered accordingly. It is so ordered.